ROSEMARY M. RIVAS (209147)
Email: rrivas@finkelsteinthompson.com
**FINKELSTEIN THOMPSON LLP**
505 Montgomery Street, Suite 300
San Francisco, California 94111
Telephone: (415) 398-8700
Facsimile: (415) 398-8704

*Attorneys for Plaintiff Joshua Beloff*

[Additional counsel listed on signature page]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSHUA BELOFF, individually and on behalf of all others similarly situated,<br><br>                      Plaintiff,<br><br>   v.<br><br><br>NEST LABS, INC.,<br><br>                    Defendant. | Case No. _____<br><br>**CLASS ACTION COMPLAINT**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

CLASS ACTION COMPLAINT

Plaintiff Joshua Beloff, individually, and on behalf of a class of all other, similarly situated persons defined below ("Plaintiff"), demands a trial by jury and hereby complains and alleges the following claims against Defendant Nest Labs, Inc. ("Nest Labs" or "Defendant") , on information and belief except for information identified as being based on personal knowledge:

## NATURE OF THE ACTION

1.      Plaintiff brings this action on behalf of the following class ("the Class"):  All persons in the United States who purchased Nest Thermostats for personal or household use. Excluded from the Class are Defendant, its affiliates, employees, officers and directors, persons or entities that purchased Nest for resale, and the Judge(s) assigned to this case ("the Class").

2.      This class action arises from the unlawful, fraudulent and deceptive conduct of Defendant Nest Labs, Inc. ("Defendant") in connection with the manufacturing, marketing, warranting and sale of the Nest Learning Thermostat ("Nest" or "Class Device").

3.      Defendant bills the Nest as a wireless "smart" thermostat that provides substantial cost savings over traditional thermostats through technological advancements that allow Nest to more accurately gauge ambient temperature. Nest suffers from significant manufacturing and design defects, however, that render it more *inaccurate than traditional thermostats*, and thus unsuitable for its intended purpose.

4.      The defects cause the Nest's base and faceplate to heat, thereby causing it to gauge temperatures to be anywhere from two to ten degrees higher than the actual ambient temperature in the surrounding room.  Nest users consequently do not receive the benefit of the advertised energy savings.  Instead, Nest's inaccurate readings actually cause increased energy costs.

5.      Plaintiff Beloff is one such Nest customer.  Plaintiff purchased a Nest thermostat in 2013 expecting to secure the energy savings expressly promised by Nest in promotional materials. Plaintiff instead has incurred higher energy costs as a direct and proximate result of using this defective product.  Accordingly, Plaintiff brings this action seeking to recover monetary, injunctive and declaratory relief.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**JURISDICTION AND VENUE**

6.      This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d). There are more than 100 class members. The aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs. There is minimal diversity because at least one plaintiff and one defendant are citizens of different states and/or a citizen or subject of a foreign state.

7.      Venue is proper in this District pursuant to 28 U.S.C. § 1391. Defendant is headquartered and transacts substantial business (including sales and advertising) in this District, is subject to personal jurisdiction in this District, and is deemed to be a citizen of this District. In addition, the events giving rise to Class members' claims occurred in this District.

**THE PARTIES**

8.      Plaintiff Beloff is a resident and citizen of Bellvue, Washington.  In 2013, Plaintiff purchased Defendant's Nest Thermostat from Lowes.  Prior to making this purchase, Mr. Beloff reviewed Defendant's marketing material and representations online, including that Nest provides energy and cost savings, as well as accurate temperature readings.  Based on those representations, Mr. Beloff purchased the Nest at a substantial price premium compared to traditional thermostats. Plaintiff read and relied on Defendant's representations found on the Product packaging before installing the Nest.  Plaintiff's Nest packaging contained instructions to visit Defendant's website to check compatibility before installing the Product.  Following Defendant's instructions, Plaintiff visited Defendant's website to check compatibility and watched the instructional video.  Mr. Beloff would not have purchased or installed Nest if he had known the truth about Defendant's representations concerning Nest.  Instead, he would have continued to use his traditional Thermostat.  As a result of Defendant's conduct, Plaintiff has suffered injury in fact and lost money.

9.      Defendant Nest Labs, Inc. is a Delaware company with its headquarters and principal place of business located at 900 Hansen Way, Palo Alto, California 94304.  Defendant distributes Nest to several leading retailers including Amazon, EBay, Best Buy, Apple, Lowes, and

Home Depot.  These retailers purchase Nest for resale to Defendant's intended end-customers, consumers like Plaintiff.

10.     Defendant markets and sells its Nest "Learning Thermostat" widely throughout California, and nationwide.  Defendant has manufactured, marketed, and sold Nest using the deceptive, false, and misleading claims described herein since at least 2011.

<b><u>FACTS COMMON TO ALL CAUSES OF ACTION</u></b>

11.     Beginning in 2011, Defendant began to manufacture, market and sell its flagship product: the Nest Learning Thermostat.  Nest as a wireless "smart" thermostat that provides substantial cost savings over traditional thermostats through technological advancements that purportedly allow Nest to more accurately gauge ambient temperature.

12.     Nest is an electronic, programmable, and self-learning Wi-Fi-enabled thermostat that Defendant claims optimizes heating and cooling of homes and businesses to conserve energy. The Device consists of two primary pieces of hardware. The display contains the main printed circuit board (PCB) and rotating ring, and the base houses the connection terminals, bubble level, and holes for wall anchors. Neither can function independently; if separated, the display becomes inactive until reconnected to the base.



13.     Nest is built around an operating system that allows interaction with the thermostat via spinning and clicking of its control wheel, which brings up option menus for switching from heating to cooling, access to device settings, energy history, and scheduling. Users can control Nest

manually, without a touch screen or other input device.  Users also may control Nest using applications compatible with smart phones and other devices.

14.     Defendant misrepresents that Nest's "sensors are designed to be highly accurate and react to changes in the ambient temperature more readily than most thermostats"[1] and that "[t]hree temperature sensors track your home's temperature and how quickly it changes."[2]  For example, on its website, Defendant represents that:

> Nest uses multiple temperature sensors to determine the ambient temperature with a high degree of accuracy.  The Nest Thermostat's sensors are tuned to be most useful for keeping your home consistently comfortable.  We found that responding rapidly to temperature changes gives your Nest Thermostat the most accurate data to work from.
>
> ….
>
> Nest Thermostat's sensors are designed to be highly accurate and react to changes in the ambient temperature more readily than most thermostats.[3]

15.     Nest purportedly uses proprietary, energy-saving technology called "Nest Sense." Nest Sense works through the Device's sensors, hardware and algorithms. Nest Sense's job is to gather data to use in the Device's calculations in order to more efficiently manage a home's HVAC system. To that end, Nest is intended to gather data from the following sources: three temperature sensors, designed to get a more precise measurement than a traditional thermostat; a humidity sensor; motion and light sensors that detect activity in the room at a 150-degree angle; and a WiFi connection to secure weather data from the Internet.

16.     Using data from these sources, Nest Sense creates a schedule for HVAC systems that consists of specific times of the day on each day of the week at which to activate HVAC systems, and auto-away times, which are times that Nest determines the user is not typically at home and utilizing an HVAC system.  In short, Nest supposedly is able to optimize a home's

---

[1] *See, e.g.*, http://support.nest.com/article/Why-does-the-temperature-Nest-detects-seem-different-than-my-old-thermostat

[2] https://nest.com/thermostat/inside-and-out/

[3] http://support.nest.com/article/Why-does-the-temperature-Nest-detects-seem-different-than-my-old-thermostat

HVAC settings through superior technology and minimal user interface in order minimize energy costs.

17.     Defendant has released two generations of Nest thermostats. The second generation was released in October 2012 and incorporates a new aesthetic design and new software. However, the technology utilized is substantially identical in both product offerings.

18.     Defendant has sold hundreds of thousands of Nest Thermostats.  It is estimated that Defendant has sold and continues to sell some 100,000 Nest Thermostats per month at roughly $250 per unit.[4]  Nest Thermostats are available in major retail stores nationwide and online. However, at a sales price of approximately $250, Nest retails at a substantial premium over traditional thermostats.

### A.     Defendant's Marketing Expressly Promised Substantial Cost Savings

19.     Product marketing generally focuses on various desirable attributes, both aesthetic and functional.  However, Defendant markets the Nest on one primary basis: it saves energy and decreases energy bills.  Simply put, Nest saves consumers money.

20.     Visitors to the Nest Website find rotating images of a Nest next to energy-saving slogans.  As shown below, Defendant claims that Nest "Manages half your home's energy":



---

[4] http://www.businessinsider.com/nest-revenue-2014-1

21.    Defendant further claims that Nest "Helps you save energy":



22.    Visitors to the Defendant's website also can "Take a Tour with Nest" Through a video presentation that assures prospective purchasers that Nest will revolutionize the way in which they manage utility expenses.  The "Tour" begins with an image of a traditional thermostat adjacent to the tag-line: "We didn't think thermostats mattered either":



23. The video then goes on to explain why Defendant believes thermostats *do matter* - because "they control half your energy bill":



24. Defendant then introduces the Nest Learning Thermostat, the implication being that because thermostats are directly responsible for energy costs, Nest will do a better job of managing those expenses:



25.     As the video continues, a Nest device replaces a drab traditional thermostat as the video explains that Nest "won't waste energy when you're out":



26.     Defendant's website provides an interactive image of a balancing scale to illustrate Nest's energy saving capability.  On the left half of the scale there are images of a droplet of water, a refrigerator, a light bulb, a computer, and a washing machine.  On the right side, an image of a traditional thermostat.  Above the traditional thermostat, Defendant includes a large circle with the emboldened phrase: "Half of your home's energy bill."



27.     Upon dragging the cursor across the image, the traditional thermostat is replaced by a Nest, a substantial portion of the blue circle pictured above falls away, and the statement "A correctly programmed thermostat can save about 20% on your heating and cooling bill" appears.



28.     After outlining the so-called home-energy management "problem," Defendant provides the solution:  "So we made it simple.  Nest **saves energy.  Automatically**." (emphasis added).

29.     To explain how "Nest saves energy.  Automatically," Defendant represents that after the user manually adjusts temperature settings to energy-efficient levels for only a few days to "teach" Nest Sense.  Nest Sense then determines and sets optimal temperature settings for specific

days and times.  Defendant represents that this is critical because "Changing the temp just one degree can save up to 5% on your energy use."



30.     Defendant also employs illustrative examples of families who realize energy savings by using Nest.  For example, Defendant's website depicts "Tina and Joe … retired in Phoenix in a 2,000 sq. ft. home," and whose "grandkids often come over in the afternoons."  Nest represents that Tina and Joe could realize "22% Savings."  Defendant further explains "Auto-Schedule" helped them save: "Joe looked for the Nest Leaf and turned the temp up to 75°F/25°C instead of their usual 73°F/23°C.  Auto-Schedule learned the habit and helps them save."

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19



20      31.      Defendant's website also makes clear that these are not vague assertions, but factual

21 claims premised on Defendant's own research and testing. For instance, with respect to Tina and

22 Joe, Defendant explains:

23                 Retired couple. Home a lot. Grandchildren stay at their house in

24                 the afternoon.

25

26                 Live in a 2,000 sqft home. Forced air. Electric heat. AC.

27                 Heating schedule: 7am 72°F, 9pm 68°F. Away temp 62°F.

28

Cooling schedule: 7am 74°F, 9am 76°F, 3pm 74°F, 9pm 73°F. Away temp 79°F.

Phoenix summer is hot. While Tina and Joe's schedule doesn't have a large increase in temperature during the day, they made a conscious decision to increase the temp by 2°F when the grandkids aren't over. This schedule is saving them 10% on their cooling bills.

They like to go out to play golf about twice a week, so Auto-Away saves them 20% on those days. This is 6% savings total. Finally, Airwave is working quite well in their dry, hot home and cutting their AC runtime by 30%. That saves them 9% on their cooling bills. All together, they are saving 23% with their Nest Thermostat in the summer.

The winter is mild so heating doesn't turn on much during the day. However, it turns on a lot at night because it gets cold. They've turned down the night temperature, so they are saving 18% (mild weather places have larger percentage savings). Auto-Away in the winter is saving them an additional 2%. In the winter, they are saving 20%.

With cooling costing 5 times more than heating, they're saving 22% on their heating and cooling costs with a Nest Thermostat.

http://support.nest.com/article/Explaining-Nest-thermostat-numbers.

32.    If a potential purchaser remains unconvinced after reviewing the above images, Defendant also provides an "Energy Savings Video."  The video begins by claiming that "[m]ost of

us will spend around $30,000 heating and cooling our homes during the life of our furnace or air

conditioner."



33.    As an image of numerous hands repeatedly adjusting a basic thermostat

materializes, the video continues:  "In the past there weren't any easy ways to lower that amount.

You could adjust your thermostat about 1500 times a year …"



34.    Then, an apparently complicated programmable, traditional thermostat appears, and the video explains that, in the past, the only other alternative to 1500 adjustments was to "battle with a complicated programmable thermostat."



35.    Finally, at the end of the video, a sleek Nest appears in place of the tedious alternatives of the past, as the video touts the emergence of Nest: "Now there is the Nest Learning Thermostat which is full of tools to save energy automatically."



36.     During the class period, Defendant similarly represented that:

We didn't think thermostats mattered either.  Until we found out they control half of your home's energy.  That's more than appliances, lighting, TVs, computers and stereos combined.  THE PROBLEM: 89% of programmable thermostats waste energy – about $173 a year, on average.  They're so complicated that most people don't bother to program them. ...; So we made it simple.  **Nest saves energy**. **Automatically**. (emphasis in original).[5]

37.     Defendant promises on its website and in other marketing materials that Nest effectively saves energy and decreases heating and cooling bills.  For example, Defendant expressly represents:

- [Nest] can automatically lower air-conditioning costs up to 30% [and] cuts AC runtime up to 30%;

- Teach it well and Nest can lower your heating and cooling bills up to 20%;

- Most thermostats waste 20% of your heating and cooling bill. Nest stops the waste;

- Nest is paying for itself.  Auto-Schedule makes it easy to create an energy efficient schedule that can help you save up to 20% on your heating and cooling bills.  All Nest's features combined can get you even bigger savings; and

- Save energy. Make money.[6]

38.     As with Tina and Joe, the statements above, as well as many other referenced herein, are affirmative assertions that Defendant communicate as fact.  On its website (http://support.nest.com/article/Explaining-Nest-thermostat-numbers), Defendant attempts to provide a factual basis for every "number" discussed on its website, including savings figures associated with programming, "Nest Leaf" cost savings, auto-away, seasonal savings and "Saving Energy Homes" examples.

39.     Defendant's website goes as far as to provide access to an internal whitepaper entitled, "Nest Learning Thermostat Efficiency Simulation: Update Using Data From the First Three Months."  The paper details internal testing conducted on Nest that inform the claims made

---

[5] https://nest.com/thermostat/saving-energy/
[6] http://nest.com/saving-energy/

on Defendant's website, particularly as concerns cost savings associated with a switch to Nest from traditional thermostats.

40. Similarly, Nest's packaging reads:



Learning Thermostat™

Programs itself.

**Saves energy**. (emphasis added)

41. Significantly, neither the packaging nor the materials displayed on Defendant's website disclose that Nest is defective.

**B. Nest is Inherently Defective and does not Function as Defendant Expressly Warrants.**

42. Contrary to Defendant's colorful advertising campaign, Nest does not "learn" correctly, and, as a result, does not save energy or decrease energy bills. In fact, contrary to Defendant's express statements, Nest *increases energy costs* because Nest suffers from various manufacturing and/ or design defects that cause the device to "heat up," thereby causing it to overestimate ambient temperatures from two to ten degrees higher than the actual ambient temperature. If, as Defendant asserts, "[c]hanging the temp just one degree can save up to 5% on your energy use," [7] Nest's inaccurate temperature readings may increase energy costs by 10% to 50%.

43. Nest is unsuitable for its intended purpose because it is incapable of accurately gauging ambient temperature. The very features that Defendant claims set Nest apart from other thermostats – such as WiFi connectivity, LCD screen 320x320px display, built in rechargeable

---

[7] http://nest.com/saving-energy/

1    lithium ion battery, multiple-sensors, and sensor window – also cause Nest to "heat up."

2    Consequently, Nest's baseline reading is thrown off, causing the Device to report warmer

3    temperatures than actually exist.  Because Nest gauges the temperature inaccurately,   it instructs

4    air conditioners to operate longer than necessary to reduce ambient temperature to desired levels,

5    thereby increasing energy costs

6              44.     For instance, reports from absent Class members establish that Nest's WiFi

7    connectivity negatively impacts Nest's ability to accurately gauge temperatures.  On January 26,

8    2014, a Nest user reported on the Nest Community Website that her "Nest was consistently reading

9    2 degrees above my digital room thermometer.  My Nest is not placed where sunlight or other light

10   could impact it.  I find the two degree difference annoying but based on user comments it appears

11   this is normal for the Nest."  Then she noticed that her Nest was "4 to 6 degrees" above her digital

12   room thermometer.  To resolve the problem, she "tried turning the unit off for a while and then

13   turning it back on but the significant temperature difference persisted."  She then "disconnected the

14   Nest from [her] WiFi connection.  Within about an hour, the temperature went back to the "normal

15   2 degree difference."  But as soon as she "re-established the WiFi connection, [the] larger

16   temperature difference returned."  The review concluded:  "I Think this unacceptable for the top of

17   the price point WiFi thermostat.  I would never purchase this brand again."

18            45.     Defendant's depiction of "Tina and Joe," whose "Auto-Schedule" helped them save

19   money and energy demonstrates how Nest's inaccurate temperature readings eradicate energy

20   savings.  As mentioned above, Defendant states: "Joe looked for the Nest Leaf and turned the temp

21   up to 75°F/25°C instead of their usual 73°F/23°C.  Auto-Schedule learned the habit and helps them

22   save."  If the current temperature in Tina and Joe's house is 80 degrees and Joe sets the

23   temperature to 75 degrees instead of their usual 73 degrees, Nest's inaccurate temperature readings

24   will keep the air conditioner running even when the actual ambient temperature in the room has

25   reached 75 degrees.  Since the air conditioner would remain on, the actual temperature in the room

26   would still be Tina and Joe's usual 73 degrees.  As a result, Nest itself prevents Joe and Tina from

27   realizing the promised savings and actually increases their energy costs.

28

**C.      Customer Reports Reveal that Defendant's Material Representations and Omissions are False and Misleading.**

46.      An incredible number of Nest customers have reported identical experiences of their Devices "overheating", reporting temperatures inaccurately, and increased air conditioner usage, all of which operate to increase energy costs and use.[8]

**D.      Defendant Knows that Nest Fails During Ordinary and Intended Use.**

47.      First and foremost, Defendant knows or should know that Nest devices are prone to "heating up" and unable to accurately gauge ambient temperature as a result of internal tests conducted on Class Devices during product development and prior to sale.

48.      The "Nest Community" is an interactive website and forum in which Nest customers can discuss their Devices, experiences and potential troubleshooting tips.  On information and belief, Defendant routinely monitors the Nest Community in order to identify customer concerns and pervasive problems.  As a result of myriad customer complaints concerning increased energy usage and costs *after* installing Nest, Defendant knows or should know that Nest is defective.  The following are a few customer complaints that reveal Nest to be inherently defective:

In April 2013, one customer wrote on the Nest website:

> **I taped two different digital thermometers next to Nest and waited a day for temps to settle … Nest reads at least 2 degrees warmer than the calibrated thermometers…. So I feel this poor temperature calibration provides a false sense of energy savings.  Nest needs to provide better temperature calibration….**

> **I just spoke with Nest 2nd level support.  He confirms for me that Nest engineers feel that temperature calibration (compared to another thermometer/thermostat) might be within 4 degrees difference ….  So although I measured a range of temp differences with Nest being 1.6 to 2.3 degrees higher than two different digital thermometers, this is "insignificant," to quote Nest.  To paraphrase, the difference might be due to what I call self-heating from the internal WiFi operation, and in the way in which Nest calculates temperature.  So I see that by design, Nest's engineers expect that Nest will: 1. Never show a temperature accurate to a digital thermometer/thermostat (within 4**

---

[8] A simple use of the search term "temperature" on Defendant's "Nest Community" webpage, where customers can post comments and questions, results in dozens of separate discussions concerning the inaccuracy of Nest Thermostats' temperature readings.  *See* https://community.nest.com/search.jspa?q=temperature

**degrees; 2. Temperature reading will vary depending on self-heating from WiFi, display use**…[9] (emphasis added).

On May 27, 2013, another customer wrote on the Nest website:

**Nest thinks temp is about 3 degrees warmer than it is, and the A/C seems to run more often than it used to when set on 74**. I checked with an IR laser thermostat throughout the house and it consistently read 71, but the Nest was measuring 74. …. Curiously, **when I aimed the laser directly on the Nest faceplate, it measured 74 while the surrounding wall measured 71. I think the electronics within the Nest are actually heating the inside of it up 3 degrees higher than ambient.** And my Nests are not in the sunlight. Definitely need temperature calibration." (emphasis added).[10]

On July 25, 2013, another customer wrote on the Nest website:

I installed a Nest last week and I was initially pleased with its performance. Last night however, I noticed that the room seemed hot, so I walked over to the Nest and **it was showing that the temperature was 96 degrees, and it was trying to cool to 78 deg. The actual room temperature was close to 82 degrees**…(emphasis added).[11]

On November 26, 2013, another customer wrote on the Nest website:

I installed mine about November 15th, 2013. It has the same issue - indicating a temperature that's consistently a little more than two degrees higher than actual room temperature. That's irritating for an expensive, state-of-the-art device. More so if the supplier does not consider the problem significant. The primary purpose of this device depends upon ACCURATE TEMPERATURE REGULATION.

On December 14, 2013, another customer wrote on the Nest website:

Wow - I am not impressed with NEST. **I had the same problem with it reading close to 10F higher. The base plate was definitely warm to the touch** …. I also called support before installation to check compatibility and I was told it would be fine. (emphasis added).

49.     The following customer complaints are transcribed from webpages of retailers which are authorized to sell Nest. The complaints alerted, or should have alerted, Defendant to the defect present in every Nest offered for sale:

On May 18, 2013, another customer wrote on Amazon.com:

**There seems to be a major design flaw in this product. It fails at the most basic level of thermostat functionality, which is the measuring of Room Temperature!**

**It always shows the room temp 4-6 degrees warmer than it really is!!** It is also very slow in changing. For example, I had 3 thermostats side by side, one of which was the Nest. I left the doors/windows open, the other 2 OLD thermostats reached 62 degrees simultaneously with in about 5-10 minutes. The Nest was still showing 74 an hour later!!! That's grossly wrong!!!

---

[9] https://community.nest.com
[10] https://community.nest.com
[11] https://community.nest.com/message/8163#8163

I tried 2 Nest thermostats and both had the same problem even after being on Tech Support line for 3 days, downloading the latest firmware, resetting to factory defaults and disabling wifi.  It still reads the temp 4-6 degrees warmer.

Finally the Tech Support lady said, it is what it is, and you can return it if you can't live with it!!  I asked if this is something they are working on?  She couldn't even confirm that.  It is a shame such an ambitious piece of technology can not even read the temp correctly!  How can you use a thermostat that thinks the room is sometimes 8 degrees hotter than it really is? …. (emphasis added).

On July 30, 2013, another customer wrote on Amazon.com:

The [Nest] wiring base was very warm to touch, not good.  Then [Nest support] tell[s] me to try to return it to Amazon, but it's after the return window by 10 days. ….

**Apparently this is a known issue internally Nest corporate and engineering, they are investigating, but there is no time frame for the fix,** and likely a new base design would be the fix.  They are not at all clear as to how they will address this publicly (replacing existing bases automatically, case-by-case, free, charge (which would be ludicrous if they charged)).

On October 22, 2012, another customer wrote on Amazon.com:

I bought the second generation Nest from Lowes the day it was released.  I verified the compatibility on Nest's website.  Installation was a breeze and so was the initial setup. Everything was smooth and it started to cool my house as expected. Five days later I noticed that the temperature reading on Nest was a tad higher than the actual room temperature.  When my room was at 78 degrees Nest showed 82.  A few hours later the reading went to 83 and kept increasing.  I felt the warmness on the surface of the (beautiful) display so I took the unit off the base from the wall.  The back side of Nest was hot. It felt like it's been doing some heavy duty computations. (emphasis added).[12]

     50.     Indeed, many unhappy customers reported these experiences directly to

Defendant:[13]

    a.  I just spoke with Nest 2nd level support.  He confirms for me that Nest engineers feel that temperature calibration (compared to another thermometer/thermostat) might be within 4 degrees difference;

    b.  [E]ven after being on Tech Support line for 3 days, downloading the latest firmware, resetting to factory defaults and disabling wifi.  It still reads the temp 4-6 degrees warmer.  Finally the Tech Support lady said, it is what it is, and you can return it if you can't live with it!!  I asked if this is something they are working on? She couldn't even confirm that.; and

    c.  Apparently this is a known issue internally Nest corporate and engineering, they are investigating, but there is no time frame for the fix, and likely a new base design would be the fix.  They are not at all clear as to how they will address this publicly (replacing existing bases automatically, case-by-case, free, charge (which would be ludicrous if they charged)).

---

[12] http://www.Amazon.com/Nest-Learning-Thermostat-Generation-T200577/product-reviews/B009GDHYPQ/ref=dp_top_cm_cr_acr_txt?showViewpoints=1
[13] https://community.nest.com

CLASS ACTION COMPLAINT

51.    Defendant directly responds to many complaining customers directly on its own website, as well as those of third-parties, further evidencing its knowledge of the problems plaguing Nest.   By way of example, the following exchange is one of many that occurred on Amazon.com between an unhappy customer and the "Nest Support-Manufacturer":

**Customer**, December 28, 2013:

> We installed [Nest] after getting it for Christmas.  The temperature is 9 degrees off, and gets even more off the longer we leave it on.  Yes it looks nice, but if you want something in your house that actually regulates temperature, go with a reliable thermostat company.

**Nest**, December 30, 2013:

> Comparing the temperature the Nest Thermostat reads to other thermostats and thermometers is tricky.  The way thermostats calculate temperature is often different, and seemingly small differences in the environment can dramatically affect the temperature your thermostat shows.  We've put together some details on why the number might seem different than what you would expect at the link below: http://support.nest.com/article/Why-does-the-temperature-Nest-detects-seem-different-than-my-old-thermostat  ....

**Customer**, December 30, 2013:

> We installed two nests, both from Amazon, both did the same thing.  And I understand that some thermostats read differently, but when you have thermostats and plain thermometers reading the same, it is different.  I read the crap you posted on your website, it didn't help. ....
> The crap is already in a box on its way back to Amazon to be refunded.  There was such a long wait for phone support and no reply to an email.  Your support is just about as good as your thermostats are at reading temperatures.

52.    The link Defendant provided to the customer above directs users to a "Nest Support" page entitled "Why does the temperature the Nest Learning Thermostat detects seem different than my old thermostat?"  But Defendant's so-called explanation unfairly shifts blame to Nest-victims and operates to actively conceal the fraud perpetrated by Defendant.  For instance, Defendant claims that the temperature "variations" may be due to "Manual Thermostat Adjustments" because "[w]hen making many adjustments on your Nest Thermostat, the warmth of your hand may cause the Nest Thermostat's sensors to raise the ambient temperature displayed." [14] Thus, according to Defendant, the momentary adjustment by hand is causing the Nest unit to heat up.  But if a brush against a human hand can cause Nest to heat up, surely warmth generated by the

---

[14] http://support.nest.com/article/Why-does-the-temperature-Nest-detects-seem-different-than-my-old-thermostat

components *inside* Nest are similarly able to cause the temperature gauge to display an inaccurately high reading.

53.     On the same page, Defendant also suggests that "Room Placement" may be the cause of the temperature "variations":

> After replacing your old thermostat with a Nest Thermostat, your previous thermostat may display a different ambient temperature than your Nest.  In many cases, this is because your previous thermostat is no longer installed on your wall.  Surprisingly, the air temperature can vary dramatically between two areas of the same room that are separated by only a few feet.  To properly compare your old thermostat to the Nest Thermostat, hold your old thermostat up to the wall within a few inches to the right or left of the Nest Thermostat.  It is important to make sure that both thermostats are the same height from the floor.  Be sure to hold your old thermostat in a way that won't cause its sensors to detect the warmth of your hand.  After several minutes your old thermostat should adjust its detected temperature.

But, as set forth in the examples above, customers have done just as Defendant instructs and the temperature reading is still wrong:

> a.     I had 3 thermostats side by side, one of which was the Nest.  I left the doors/windows open, the other 2 OLD thermostats reached 62 degrees simultaneously with in about 5-10 minutes.  The Nest was still showing 74 an hour later!!! That's grossly wrong!!!
>
> b.     [W]hen I aimed the [IR] laser directly on the Nest faceplate, it measured 74 while the surrounding wall measured 71.  I think the electronics within the Nest are actually heating the inside of it up 3 degrees higher than ambient.  And my Nests are not in the sunlight.

54.     Finally, Defendant knew or should have known about the problems with Nest's temperature reading based on pre-market testing.  Testing a thermostats' temperature reading before promising that it is "accurate" and will result in energy savings is standard industry practice.

**E.     The NAD Recommended that Defendant Discontinue Advertising Claims.**

55.     Defendant's false and misleading representations concerning Nest have been condemned by the National Advertising Division of the Council of Better Business Bureaus ("NAD"), an investigative unit of the advertising industry's self-regulatory system.  On June 20, 2013, the NAD took the extraordinary step of recommending that Defendant stop making a number of inaccurate and misleading claims about Nest thermostats, and Defendant agreed to discontinue certain claims that NAD believed to be substantially false.  For example, the NAD recommended

that Defendant stop representing that its Nest Thermostats "cut AC runtime up to 30%."[15] Following review of Defendant's evidence, the NAD also urged Defendant to discontinue its unsupported specifically quantified claims such as "89% of other programmable thermostats are not programmed because they're so complicated that most people don't bother to program them" and "other thermostats waste energy."[16]  Most importantly, however, Defendant "voluntarily discontinued claims that the Nest Learning Thermostat "can automatically lower air-conditioning costs up to 30%."[17]

56.     Furthermore, NAD confirmed the pervasiveness of Defendant's materially false assertions and omissions and noted that Defendant's specious claims "appeared in print and Internet advertising, point-of sale and promotional materials, and on product packaging …."

## CLASS ACTION ALLEGATIONS

57.     Plaintiff brings this action on his own behalf, and on behalf of the Class defined in paragraph 1 above pursuant to Rule 23(a), as well as Rule 23(b)(2) and Rule 23(b)(3), of the Federal Rules of Civil Procedure.

58.     Rule 23(a)(1) requires the class to be sufficiently numerous such that joinder of all class members is impracticable. The exact number and identities of individual Class members is unknown at this time. That information is in the sole possession of Defendant. Based on the popularity of the Nest Learning Thermostat, there likely are millions of Class members..

59.     Rule 23(a)(2) requires the class claims to contain common issues of fact or law. Here, the common issues include, but are not limited to:

  a.  Whether Defendant breached an express warranty made to Plaintiff and the Class;

  b.  Whether Defendant breached an implied warranty made to Plaintiff and the Class;

  c.  Whether Defendant advertised or marketed Nest Thermostats in a way that was false or misleading;

---

[15] http://www.asrcreviews.org/2013/06/nad-recommends-nest-labs-modify-discontinue-certain-advertising-claims-for-nest-programmable-thermostats-claims-challenged-by-honeywell/
[16] http://www.asrcreviews.org/2013/06/nad-recommends-nest-labs-modify-discontinue-certain-advertising-claims-for-nest-programmable-thermostats-claims-challenged-by-honeywell/
[17] http://www.asrcreviews.org/2013/06/nad-recommends-nest-labs-modify-discontinue-certain-advertising-claims-for-nest-programmable-thermostats-claims-challenged-by-honeywell/

d.   Whether Defendant's conduct was false, misleading, or reasonably likely to deceive reasonable consumers;

e.   Whether Class members have been injured by Defendant's conduct;

f.   Whether Class members suffered an ascertainable loss as a result of Defendant's misrepresentations; and

g.   Whether Class members are entitled to damages, restitution, injunctive relief, and/or monetary relief and, if so, the amount and nature of such relief;

h.   Whether Defendant violated California Civil Code §§ 1750, *et seq.*;

i.   Whether Defendant violated California Business & Professions Code §§ 17200, *et seq.*; and

j.   Whether Defendant violated California Business & Professions Code §§ 17500, *et seq.*

60.   The claims of the named Plaintiff are typical of the claims of the Class in accordance with Rule 23(a)(3) because Plaintiff (a) was exposed to Defendant's false and misleading packaging, marketing, and promotion of Nest Thermostats; (b) relied on Defendant's misrepresentations; and (c) suffered a loss as a result of his purchase.  Each Class member was subjected to the same conduct, was harmed in the same way, and has claims for relief under the same legal theories.

61.   Rule 23(a)(4) requires the class representative and class counsel to adequately represent the Class. Plaintiff intends to prosecute this class action vigorously on behalf of the Class, and has no conflicts or interests antagonistic to absent Class members. Class Counsel are experienced in handling class and complex litigation, including claims involving product defects and warranty issues.

62.   Rule 23(b)(3) requires that common issues predominate over any issues impacting individual Class members. The common issues identified above predominate. The only individual issue that may arise relates to the dollar amount of each Class member's damages, which would not defeat a finding of predominance.

63.     Rule 23(b)(3) also requires that the class action be superior to all other available means of fair and efficient adjudication of the Class' claims. The monetary value of each individual Class member's claims is small compared to the burden and expense of individual litigation. Judicial economy is served by litigating the Class claims in one case.

64.     Rule 23(b)(2) requires proof that Defendant acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final equitable relief with respect to the Class as a whole. The Defect, and Defendant's failure to remedy the Defect, is uniform and predicated on standard policies and practices.

**COUNT I**
**Violation of California's Consumers Legal Remedies Act ("CLRA"),**
**California Civil Code §§ 1750, *et seq.***

65.     Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

66.     Plaintiff and the Class members are consumers who purchased Nest for personal, family or household purposes.  Plaintiff and the Class members are "consumers" as that term is defined by the CLRA in Cal. Civ. Code § 1761(d).  Plaintiff and the Class members are not sophisticated experts with independent knowledge of thermostat design, temperature reading, energy saving, cost saving, or other characteristics of thermostats.

67.     The Nest Thermostats that Plaintiff and other Class Members purchased from Defendant were "goods" within the meaning of Cal. Civ. Code § 1761(a).

68.     Defendant's actions, representations, and conduct have violated and continue to violate the CLRA because they extend to transactions that intended to result in, or which have resulted in, the sale of goods to consumers.

69.     Through the various affirmative statements and omissions identified above, Defendant misrepresented that Nest was capable of accurately reading temperature and providing energy and cost savings, and thereby engaged in deceptive business practices prohibited by the CLRA, California Civil Code sections 1750, et seq., including (1) representing the products has characteristics, uses, benefits, and qualities which they do not have; (2) representing the products

1    are of a particular standard, quality, and grade when they are not; and (3) advertising the products

2    with the intent not to sell them as advertised.

3         70.    Through internal testing, as well as customer complaints submitted directly to

4    Defendant and posted on third-party websites, Defendant knows or should know that Nest is

5    defective and does not function as represented. Yet Defendant failed to make appropriate

6    disclosures despite its superior knowledge and affirmative misrepresentations to the contrary.

7         71.    A reasonable consumer would not have purchased or paid as much as for Nest had

8    Defendant disclosed its defective condition or refrained from the affirmative misstatements

9    identified above because that information is material to a reasonable consumer.

10        72.    Plaintiff and the Class suffered injuries caused by Defendant because: (a) they

11   would not have purchased Nest Thermostats on the same terms if the true facts were known

12   concerning Nest's temperature readings, and Defendant's energy and cost savings representations;

13   (b) they paid a substantial price premium compared to traditional thermostats due to Defendant's

14   representations that Nest would accurately read temperature and provide energy and cost savings as

15   described above; (c) they did not receive the promised energy-cost savings; and (d) Nest did not

16   have the characteristics, uses, or benefits Defendant promised.

17        73.    Under California Civil Code § 1780(a), Plaintiff and members of the Class seek

18   injunctive and equitable relief for Defendant's violations of the CLRA. After mailing appropriate

19   notice and demand under California Civil Code § l782(a) & (d), Plaintiff will subsequently amend

20   this Complaint to also include a request for damages. Plaintiff and members of the Class request

21   this Court enter such orders or judgments as may be necessary to restore to any person in interest

22   any money which may have been acquired with such unfair business practices, and for such other

23   relief, including attorneys' fees and costs, as provided in Civil Code § 1780 and the Prayer for

24   Relief.

25        74.    Plaintiff includes an affidavit with this Complaint that shows venue in this District

26   is proper, to the extent such an affidavit is required by Cal. Civ. Code § 1780(d).

27

28                                          **COUNT II**

**Violation of California's Unfair Competition Law ("UCL"),
California Business & Professions Code §§ 17200, *et seq.***

75.     Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

76.     Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

77.     Defendant is subject to California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, et seq.  The UCL provides, in pertinent part: "Unfair competition shall mean and include unlawful, unfair or fraudulent business practices and unfair, deceptive, untrue or misleading advertising…."

78.     Defendant has violated the fraudulent prong of California Business and Professions Code section 17200 et seq., because its misrepresentations and omissions regarding Nest are likely to deceive a reasonable consumer, and thereby would be material to a reasonable consumer.

79.     Defendant has violated the unfair prong of California Business and Professions Code section 17200 et seq. because its acts and practices described above offend established public policy and cause harm to consumers that greatly outweigh any benefits associated with those practices. Defendant's conduct has also impaired competition within the thermostat market and has prevented Plaintiff from making fully informed decisions about whether to purchase a Nest or traditional thermostat, as well as the price to be paid to purchase them.

80.     Further, Defendant's sale of Nest despite pre-market tests revealing its inaccuracy, or, alternatively, Defendant's failure to test Nest before releasing it on the market, offends public policy.  Defendant's refusal to remedy the defect or correct its representations after numerous customers requested that Defendant do so is unscrupulous.

81.     Defendant has violated the unlawful prong of California Business and Professions Code section 17200 et seq. because the acts and practices described above violate California laws, including, but not limited to, the California False Advertising Law and the Consumer Legal Remedies Act.

82.     Plaintiff and the Class members acted reasonably when they relied on Defendant's misrepresentations and omissions and purchased Defendant's products. Moreover, Plaintiff and Class members are presumed to have relied on such misrepresentations and omissions because they appeared in pervasive advertising campaigns and related to material facts – Nest's ability to save consumers money over traditional thermostats.

83.     Plaintiff and the Class lost money or property as a result of Defendant's UCL violations because: (a) they would not have purchased Nest on the same terms if the true facts were known concerning the inaccuracy of Nest's temperature readings, and the falsity of Defendant's energy and cost savings representations; (b) they paid a price premium for Nest Thermostats due to Defendant's promises and representations described herein; (c) they did not receive the promised energy-cost savings; and (d) Nest Thermostats did not have the characteristics, uses, or benefits as promised.

84.     All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Defendant's business. Defendant's wrongful conduct is part of a pattern or generalized conduct that is still perpetuated and repeated, both in California and nationwide.

85.     Plaintiff requests this Court enter such orders or judgments to enjoin Defendant from continuing its unfair, unlawful, and/or deceptive practices and to restore to Plaintiff and members of the Class any money Defendant acquired by unfair competition, as provided in California Business and Professions Code § 17203, and for such other relief as set forth below.

## COUNT III
### Violation of California's False Advertising Law ("FAL"), California Business & Professions Code §§ 17500, *et seq.*

86.     Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

87.     Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

88.     California's False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, et seq., makes it "unlawful for any person to make or disseminate or cause to be made or disseminated

before the public in this state, ... in any advertising device ... or in any other manner or means whatever, including over the Internet, any statement, concerning ... personal property or services, professional or otherwise, or performance or disposition thereof, which is untrue or misleading and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

89.     Defendant committed acts of false advertising, as defined by §§17500, et seq., by making misrepresentations about Nest's accuracy and energy and cost saving capabilities as described herein, as well as by failing to disclose that Nest are inherently defective because they "heat up" and fail to accurately record ambient temperature, thereby increasing energy usage and costs.

90.     Defendant caused to be made or disseminated through California and the United States, through advertising affirmative misstatements and omissions that were untrue or misleading with respect to Nest, and which were known, or which by exercising reasonable care should have been known, to Defendant to be untrue and misleading to consumers and Plaintiff.

91.     Defendant's misrepresentations and omissions concerned material facts, namely Nest's ability to reduce energy use and associated costs.  As such, Defendant's pervasive advertising is and was likely to deceive the general public.

92.     Plaintiff and the Class lost money or property as a result of Defendant's FAL violations because:  (a) they would not have purchased Nest on the same terms if the true facts were known concerning the inaccuracy of Nest's temperature readings, and the falsity of Defendant's energy and cost savings representations; (b) they paid a price premium for Nest Thermostats due to Defendant's promises and representations described herein; (c) they did not receive the promised energy-cost savings; and (d) Nest Thermostats did not have the characteristics, uses, or benefits as promised.

93.     All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Defendant's business.  Plaintiff requests this Court enter such orders or judgments as may be necessary to enjoin Defendant from continuing their false advertising and to restore to

Plaintiff and members of the Class any money Defendant acquired by unfair competition, and for such other relief set forth below.

## COUNT IV
### Breach of Express Warranty

94.     Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

95.     Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

96.     Plaintiff, and each Class member, formed a contract with Defendant at the time Plaintiff and each Class member purchased a Nest Thermostat.  As described above, the terms of the contract include the promises and affirmations of fact relating to the energy savings, cost savings, temperature accuracy and responsiveness representations on Defendant's product packaging, online, and through its marketing campaign.  Defendant's online and packaging representations became part of the basis of the bargain and are part of a contract between Plaintiff and the members of the Class on the one hand, and Defendant on the other, and thus constituted express warranties.

97.     Defendant, as the designer, manufacturer, marketer, distributor, or seller expressly warranted, among other things, the following material terms about Nest Thermostats:

a.    "[Nest Thermostats] can automatically lower air-conditioning costs up to 30%"

b.   "Teach it well and Nest can lower your heating and cooling bills up to 20%"

c.   "Most thermostats waste 20% of your heating and cooling bill. Nest stops the waste."

d.   "Save energy. Make money."

e.   "Nest thermostat's sensors are designed to be highly accurate and react to changes in the ambient temperature more readily than most thermostats."

98.     Defendant sold the goods to Plaintiff and the other Class members, who bought the goods from Defendant.  Plaintiff and the Class members are ordinary consumers who are not versed in the art of inspecting and judging the properties of thermostats.  Plaintiff and the Class

acted reasonably based on Defendant's temperature accuracy, cost saving, and energy saving representations.

99.     Defendant breached the terms of this contract, including the express warranties described in this Count IV as well as above, because Nest (a) does not accurately read temperature; (b) does not lower air-conditioning costs up to 30%; (c) does not lower heating and cooling bills up to 20%; (d) does not stop wasting 20% of customer's heating and cooling bills; (e) does not save energy; (f) does not "make money"; (g) and was not "designed to be highly accurate and react to changes in the ambient temperature more readily than most thermostats." Therefore, Defendant's express warranties were false, misleading and deceptive. As a result of this breach, Plaintiff and the Class did not receive the goods as warranted by Defendant.

100.     Plaintiff and Class members were injured and harmed as a direct and proximate result of Defendant's breach because: (a) they would not have purchased Nest on the same terms if the true facts were known about the purported accuracy of Nest's temperature readings, and Defendant's energy and cost savings representations; (b) they paid a price premium for Nest due to Defendant's promises described in this Count IV and above; and (c) they did not receive the promised energy-cost savings.

## COUNT V
### Breach of the Implied Warranty of Merchantability

101.     Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein.

102.     Plaintiff brings this claim individually and on behalf of the members of the Class against Defendant.

103.     Defendant is and was at all relevant times a "merchant" within the meaning of the Uniform Commercial Code ("UCC"). Defendant manufactured, distributed, and marketed Nest Thermostats, which are "goods" within the meaning of the UCC. Consequently, Defendant impliedly warranted that Nest Thermostats were merchantable, including that they could pass without objection in the trade under the contract description, that they were fit for the ordinary purposes for which such goods are used, that they were of fair average quality within the

description, that they were adequately labeled, and that they would conform to the promises or affirmations of fact made on their container or labels.  However, each of these implied warranties was false with respect to the goods of the kind sold to Plaintiff and members of the Class.  Indeed, Defendant's thermostat is not fit for the ordinary purpose for which thermostats are used – measuring and controlling temperature.

104.     Plaintiff and Class members purchased Nest Thermostats for the purpose of accurately determining and responding to ambient temperature.

105.     The Nest Thermostats were not altered by Plaintiff or Class members.

106.     The Nest Thermostats were defective when they left the exclusive control of Defendant.

107.     Defendant knew Nest would be purchased and used by Plaintiff and Class members without additional testing.  The Nest Thermostats were unfit for their ordinary purpose, and Plaintiff and Class members did not receive the goods as warranted.

108.     More specifically, Defendant breached its implied warranty of merchantability to Plaintiff and the Class because the Nest Thermostats would not pass without objection in the trade because they were incapable of performing the functions that thermostats are intended to perform. They are not capable of precisely controlling the cooling and heating functions and are incapable of accurately determining and responding to the ambient temperature.

109.     As a direct and proximate cause of Defendant's breach of the implied warranty, Plaintiff and Class members were injured because (a) they would not have purchased Nest if they had known that the products were not capable of precisely controlling the heating and cooling functions, contributing to cost and energy savings and accurately determining and/or responding to the ambient temperature; (b) they paid a price premium for the Nest Thermostats based on Defendant's warranties; (c) they did not receive the promised energy-cost savings; and (d) the Nest Thermostats did not have the characteristics, uses, or benefits as promised.

## COUNT VI
### Breach of Implied Warranty of Fitness for a Particular Purpose

110.    Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

111.    Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

112.    Defendant marketed, distributed, and/or sold Nest with implied warranties that it was fit for its particular purpose of contributing to energy and cost savings.

113.    At the time of purchasing Nest, Plaintiff and the Class members intended to use Nest to realize energy and cost savings.

114.    Because Defendant extensively marketed Nest as an energy and cost saving device, Defendant knew at the time it sold Nest to Plaintiff and the Class that the Plaintiff and the Class intended to use Nest for that particular purpose.

115.    Plaintiff and the Class members relied on Defendant's skill and judgment to furnish goods suitable for managing "half your home's energy bill" and for energy and cost savings. Plaintiff and Class members purchased Nest Thermostats in reliance upon Defendant's implied warranties.

116.    At the time that the Nest Thermostats were sold, Defendant knew or had reason to know that Plaintiff and Class members were relying on Defendant's skill and judgment to select or furnish a product capable of operating as an energy and cost saving device.

117.    The Nest Thermostats were not altered by Plaintiff or Class members.

118.    As a direct and proximate cause of Defendant's breach of the implied warranty, Plaintiff and Class members have been injured and harmed because: (a) they would not have purchased the products on the same terms if the true facts were known concerning Nest Thermostats' design; (b) they paid a price premium for the products due to Defendant's promises that the Nest Thermostats were capable of delivering energy and cost savings; and (c) they did not receive the promised energy-cost savings.

## COUNT VII

Common Law Fraud

119.     Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

120.     As detailed above, Defendant affirmatively misrepresented and concealed material facts concerning the quality and attributes of Nest.

121.     Defendant had a duty to disclose the true nature of Nest and its defective condition based on its superior knowledge, as well as affirmative misrepresentations and omissions to the contrary.

122.     Defendant affirmatively misrepresented and/or actively concealed material facts, in whole or in part, intending to induce Plaintiff and members of the Class to purchase Nest.

123.     Plaintiff and the Class relied on Defendant's material misrepresentations because, but for these misrepresentations, Plaintiff and Class members would not have purchased Nest, or would not have purchased Nest at a premium over traditional thermostats.

124.     Plaintiff and the Class were unaware of material information Defendant failed to disclose and would not have acted as they did if they had known of the concealed and/or suppressed facts.

125.     Further, Plaintiff and Class members did not experience the energy and cost savings promised by Defendant.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and all others similarly situated, seeks judgment against Defendant as follows:

     a.   For an order certifying a nationwide Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as the representative of the Class and Plaintiff's attorneys as Class Counsel;

     b.   For an order declaring that Defendant's conduct violates the statutes referenced herein;

c.   For an order finding in favor of Plaintiff, and the nationwide Class on all counts asserted herein;

d.   For compensatory and punitive damages in amounts to be determined by the Court and/or jury;

e.   For prejudgment interest on all amounts awarded;

f.   For an order of restitution and all other forms of equitable monetary relief;

g.   For injunctive relief as pleaded or as the Court may deem proper;

h.   For an order awarding Plaintiff and the Class their reasonable attorneys' fees, and expenses;

i.   Damages, restitution, and/or disgorgement in an amount to be determined at trial; and

j.   For such other and further relief as the Court may deem proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all causes of action and issues so triable.

Dated: April 11, 2014                  Respectfully Submitted,

**FINKELSTEIN THOMPSON LLP**

By: /s/ Rosemary M. Rivas
        Rosemary M. Rivas

505 Montgomery Street, Suite 300
San Francisco, California 94111
Telephone: (415) 398-8700
Facsimile: (415) 398-8704

Bryan L. Clobes
**CAFFERTY CLOBES MERIWETHER & SPRENGEL LLP**
1101 Market St., Suite 2650
Philadelphia, Pennsylvania 19107
Telephone: (215) 864-2800
Facsimile: (215) 864-2810
Email: bclobes@caffertyclobes.com

Daniel O. Herrera
Christopher Sanchez
**CAFFERTY CLOBES MERIWETHER & SPRENGEL LLP**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

30 N. LaSalle, Suite 3200
Chicago, Illinois 60602
Telephone: (312) 782-4880
Facsimile: (312) 782-4485
Email: dherrera@caffertyclobes.com
csanchez@caffertyclobes.com


*Attorneys for Plaintiff Joshua Beloff*

### AFFIDAVIT OF ROSEMARY M. RIVAS

I, Rosemary M. Rivas, declare as follows:

1.      I am a partner with the law firm Finkelstein Thompson LLP, counsel for Plaintiff Joshua Beloff in this action. I am admitted to practice law in California and before this Court, and am a member in good standing of the State Bar of California. This declaration is made pursuant to California Civil Code § 1780(c). I make this declaration based on my research of public records and also upon personal knowledge and if called upon to do so, could and would testify competently thereto.

2.      Based on my research of public records and personal knowledge, Defendant Nest Labs, Inc. has its headquarters and principal place of business located within this County, as alleged in the accompanying Class Action Complaint.

I declare under penalty of perjury under the laws of the United States and State of California this 11th day of April 2014 in San Francisco, California that the foregoing is true and correct.


                                                    /s/ Rosemary M. Rivas_____